UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIGUEL DIAZ,

       Petitioner,

                                    Case No. 1:09-cv-610
v.                                      Hon. Robert J. Jonker

CAROL R. HOWES,

       Respondent.

_____/

**REPORT AND RECOMMENDATION ON REMAND**

### I.      Introduction

Petitioner, Miguel Diaz, is a prisoner currently incarcerated at a Michigan correctional facility. Diaz, through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The undersigned reviewed the petition and recommended that it be dismissed. *See* Report and Recommendation ("R&R") (June 15, 2012) (docket no. 24). In reaching this determination, the undersigned noted the deficiencies in the materials provided to the Court by both petitioner's counsel and respondent's counsel. The parties' briefing of the habeas issues was, to say the least, incomplete and confusing. Petitioner filed objections to the R&R which were based, in large part, on 106 pages of documents which were not part of this Court's record and which had not previously been submitted to the Court. For her part, respondent filed 129 pages of supplemental Rule 5 materials which included one of Diaz' post-trial motions. *See* Rule 5 material (docket no. 27). After reviewing the objections, the District Judge remanded this matter to the undersigned for consideration of the issues "on the complete record." *See* Order of Remand (docket no. 30). After determining that the additional records submitted by the parties were themselves incomplete, the

undesigned directed respondent to file supplemental Rule 5 materials which related to all of petitioner's state court criminal proceedings.  In response to this motion, respondent filed an additional 988 pages of Rule 5 materials.  *See* Rule 5 materials (docket no. 32).  Having finally received a complete record of petitioner's state criminal proceedings, the Court is now in a position to address Diaz' habeas petition.

## II.    Factual Background

On January 26, 1998, Diaz was charged in two-count felony information charging him with conspiracy to deliver cocaine (Count 1) and the delivery of cocaine (Count 2).  Information (docket no. 32-2 at p. ID# 581).  The trial court granted petitioner's motion to quash the delivery charge, but denied the motion with respect to the conspiracy charge.  Following a jury trial in Branch County, Diaz was convicted of conspiracy to deliver between 225 and 650 grams of a mixture containing cocaine, M.C.L. §§ 750.157a and 333.7401(2)(a)(ii).  *See People v. Diaz,* No. 227045, 2002 WL 31450796 at *1 (Mich. App. Nov. 1, 2002).[1]  On March 22, 2000, Branch County Circuit Court Judge Michael H. Cherry (some times referred to as the "trial court" or "Judge Cherry") sentenced him to a term of twenty to thirty years imprisonment.  *Id.*; Sent. Trans. (March 22, 2000) (docket no. 15).  Diaz' conviction arose from the following facts established at trial:

> Just after midnight on June 15, 1997, the Branch County Sheriff's Department and several other law enforcement agencies executed simultaneous search warrants on two homes in Branch County.  They also made twenty-two arrests.  The search and arrest warrants were the culmination of an eighteen-month investigation. The main target of that investigation was Christopher Smith.  He and his wife Brenda were arrested during the raid on his home.  Janet Palmateer and Wendy Smith, Christopher's sister, were arrested at the raid on Janet's home.

---

[1] The Court notes that the trial transcript for February 16, 2000 submitted by respondent did not include the jury's verdict (pages 194-97).  *See* Trial Trans. (Feb. 16, 2000) (docket no. 14).  However, the missing pages appear in a subsequently filed transcript. *See People v. Diaz*, No. 136755 (Mich.) (docket no. 32-12 at p. ID# 1235).

Christopher, Brenda and Janet were arrested for delivery of cocaine. Wendy was arrested for disorderly conduct.

After Wendy posted bond and obtained release from jail, she contacted Sergeant Dennis Gatke, who was in charge of the narcotics investigations. She wanted to assist her family and friends in getting out of jail. Janet, who was still in jail, also contacted Gatke. After speaking with the women separately, Gatke set up telephone surveillance at Janet's home. Wendy, who agreed to cooperate with police, planned to handle recorded telephone calls from Janet's home. Three telephone calls between Wendy and defendant were recorded between June 18 and June 20, 1997. [FN1] During the calls, talking in slang, Wendy and defendant arranged a transaction of cash for "shit," "junks," "product," or "stuff." Wendy testified that they were discussing the sale of cocaine. Defendant testified that they were discussing the sale of cheap cars. [FN2] Calls between Wendy and Carlos Reyes, as well as calls between Wendy and Luis Soto, were also recorded. The tapes were transcribed and played for the jury.

> [FN1. Gatke testified that he knew of defendant's existence before speaking with Wendy and Janet. Christopher's home was in close proximity to the jail and Gatke drove by it several times a day. During his investigation, he "ran" the license plate of a car that he saw outside of Christopher's house. It was registered to defendant.]

> [FN2. Defendant's testimony in this regard was lacking. He could not innocently explain all of the statements and language heard on the tapes. For example, he could not explain the discussion about the price per "OZ." He admitted that he did not sell cars by the OZ.]

Wendy testified that she had known defendant for six or eight months before her arrest. Wendy also testified that she had previously acted as a courier for Christopher, and that she had met defendant twenty or thirty times in Chicago. Wendy would take money from Christopher and bring it to defendant. She was usually not privy to the amount of money she was carrying, but she knew that she once transported $30,000. In exchange for the cash, defendant gave cocaine directly to Wendy to bring back to Christopher. Defendant once gave Wendy a brick of cocaine, the size of two real bricks, to carry from Chicago back to Michigan. However, Wendy testified that she never saw defendant in Michigan.

On March 15, 1997, Wendy went to Chicago with Janet and her husband. Wendy wanted to buy Janet an ounce of cocaine for a birthday present. Wendy contacted defendant and he met them at a gas station in Chicago. Wendy and Janet entered defendant's car. Wendy gave defendant $1,000 and obtained the ounce of cocaine. At that time, defendant asked Wendy and Janet if they were interested in doing business with him because Christopher was using increasing amounts of

cocaine and was unreliable. Wendy and Janet informed defendant that they would discuss the matter. The following day, they agreed to get involved.

Wendy testified that, thereafter, Janet was responsible for making the arrangements with defendant to obtain the cocaine. Reyes and Soto would deliver the cocaine to various places, including Janet's home, an area behind an abandoned storage facility in Coldwater, or different freeway exits in Indiana just across the Michigan state line. The deliveries occurred approximately once a week. Wendy testified that she and Janet usually obtained one to three ounces at a time. They used some of the cocaine and sold the rest to buyers in Coldwater and Lansing. In particular, they sold cocaine to two men in Lansing. Defendant knew about these two buyers because he asked Wendy to contact them.

Janet confirmed Wendy's testimony. Janet testified that she first met defendant when she and Wendy picked up a car from his house in Chicago. No cocaine transaction took place at that time. On March 15, 1997, Janet, her husband and Wendy went to Chicago. Wendy paid defendant $1,000 for an ounce of cocaine. During the transaction, defendant asked them to go into business. They thought about it and later agreed. They met defendant in La Porte, Indiana, and gave him $1,100. The following day, he gave them three ounces of cocaine. This type of dealing continued between that time and the June 1997 arrests. Janet and Wendy obtained cocaine one to three times per week in amounts varying from one to six ounces. Janet testified that she would page defendant and he would return her call. She would then make arrangements with him. Usually, she would also specify a place to meet Reyes and Soto, who were defendant's delivery boys. Sometimes, however, they would call her directly to make delivery arrangements. Janet testified that she received the cocaine directly from defendant on only two occasions. The cocaine money was either given to Reyes and Soto, or was sent through Western Union. According to Janet, defendant was aware that she and Wendy were dealing to the men in Lansing. Defendant asked Janet to encourage the "boys in Lansing" to buy more. Janet testified that she never saw defendant with Reyes or Soto.

At trial, Wendy testified that defendant told her and the others that if they ever needed help, he would get them out of jail. When Wendy contacted defendant after the arrests, he told her that if she collected more money, he would send more cocaine to sell. She could use the money to get the others out of jail. Wendy did not do so. Instead, she contacted Gatke and the telephone surveillance began. Wendy admitted that she was disappointed that defendant refused to help. She also testified that defendant owed her $3,000 for a prepaid drug sale that was set to take place the day after the arrests. It never took place and defendant did not give back the money.

On June 20, 1997, after the last recorded conversation between defendant and Wendy, Gatke prepared Wendy to make a controlled buy of cocaine at an exit off the toll road in Elkhart, Indiana. Gatke and a reserve police officer, Chip Gerber, drove

Wendy to the meeting point in Janet's vehicle.  The group met with members of the Elkhart County narcotic task force, who were on surveillance ready to make arrests after the deal transpired.

After waiting some time, Wendy indicated that the delivery men had arrived.  She exited Janet's vehicle and approached the contact vehicle.  Gatke and Gerber, posing as the buyers from Lansing, waited in the car.  They watched Wendy enter the suspect vehicle.  Approximately four minutes later, she exited.  She tipped her hat to indicate that the deal was consummated.  When she emerged from the suspect vehicle, she had a bulge in the front of her pants.  Wendy testified that Luis was on a pay telephone outside of the car when she approached his vehicle.  She entered on the back passenger side behind Reyes.  She gave Reyes the money and obtained a black bag containing nine separate baggies of a white, powdery substance.  Soto entered the car just as she finished the deal.  Wendy stuffed the black bag into the front of her pants and exited the car.

The Elkhart task force arrested Soto and Reyes.  They also pretended to arrest Gatke, Gerber, and Wendy.  The black bag was seized from the front of Wendy's pants.  A large amount of money was seized from the suspect vehicle.  It matched the money Gatke gave to Wendy to buy the cocaine.  The money and white powder were turned over to Gatke.  The seized substance contained cocaine weighing 238.04 grams, or approximately 8.4 ounces.

Luis Soto testified pursuant to a plea agreement.  He testified that, between March and June 1997, he saw Wendy and Janet regularly to bring cocaine.  Soto testified that the amount of cocaine and money was prearranged and he simply delivered the cocaine from defendant to Janet and Wendy.  Sometimes Soto went alone and sometimes Reyes went with him.  The deliveries occurred in Indiana and Michigan.  At the time of delivery, Soto usually received $100 in cash and a sealed envelope containing cash.  He never opened the sealed envelopes, which were delivered back to defendant.  Soto testified that he changed cars frequently, getting a new one whenever defendant instructed him to do so.  Soto also testified that he occasionally went to the home of a man named Cuba in Melrose Park, Illinois, and picked up cocaine to replenish defendant's supply.  He did this at defendant's instructions.

Brenda Smith, Christopher's wife, also testified.  She was convicted of conspiracy to deliver cocaine after entering a guilty plea, and she testified that she received no bargain in exchange for her testimony.  Brenda testified that Christopher was a cocaine dealer and that defendant dealt to Christopher.  Brenda met defendant in July 1996, when Christopher brought her to defendant's house in Chicago when he picked up nine ounces of cocaine.  Defendant thereafter came to their house in Coldwater.  According to Brenda, defendant gave Christopher cars to sell as a legitimate business cover.  No money changed hands for the cars.  Brenda met

defendant in Chicago eight or ten times between July 1996 and early 1997.  Almost every time, Christopher would give defendant money and defendant would give Christopher cocaine.  Sometimes, however, they just dropped off money or picked up a car.  Brenda testified that after they stopped going to Chicago, Reyes and Soto brought the cocaine to a meeting point in Indiana or directly to their house in Coldwater.  Brenda was positive that Reyes and Soto were connected with defendant because they called defendant from her house to report when they arrived.  Occasionally, if they were running late, defendant would call and ask Brenda if they had made it there, yet.  Brenda spoke with defendant on the telephone between March and June 1997.  She admitted that she never saw defendant with Reyes or Soto.

Defendant maintained that he never dealt cocaine.  He called several character witnesses to testify that he had a steady job managing janitorial accounts for a large company, had a lot of responsibility, and never showed any signs of drug use or drug dealing.  Three of these witnesses, however, met defendant after he was arrested for the crimes in this case.

Defendant's sister, Maria Rivera, testified that she bought a home in Michigan for investment purposes.  Defendant picked out the home for her to purchase.  It was located far from any city or town.  She planned to restore it and resell it.  Rivera could not describe the home and did not know the address or even the street on which it was located.  She testified that shortly after closing on the house, defendant told her that Christopher was leaving his wife and would live in the home and pay rent.  Christopher was always late with the rent and thus, defendant had to go to the house to pick it up for her.  Rivera also testified that, in addition to his maintenance job, defendant sold cars.

Defendant testified that he was a married man and had several children.  He was employed full-time overseeing janitorial accounts for a company in Knox, Indiana.  He previously worked for several other companies in the same type of capacity.  He moved from Chicago to Knox after June 1997, because he was hired by Omni Facility Resources. [FN3]  Defendant also testified that when he was in Chicago, he bought cheap cars for resale, as a side job.  He bought eight or ten cars at a time and a friend helped fix them.  Defendant was not good about keeping receipts and could only produce a few to support that he engaged in such an occupation.  Defendant testified that he met Christopher through a car deal and, thereafter, they decided that Christopher could get "rid" of a lot of cars for defendant in Michigan.  They subsequently met once or twice a week in the 1996 and 1997 time frame.  Defendant claimed that he sold approximately thirty cars to Christopher.  At some point; Christopher stopped paying defendant for the cars.  Christopher, who had moved into the investment home of defendant's sister, was also late with his rent payments.  Eventually, defendant sent "one of the guys" down to get the payments.  Defendant testified that he sent Soto and Reyes to Michigan one or two times per

week because of the outstanding money owed.  He could not leave work to try and collect the money himself.

[FN3.  Defendant was on bond pending trial and apparently moved during this period of time.]

Defendant further testified that, at some point, he called Janet, who took care of Christopher's bookkeeping.  Defendant talked to her on the telephone about the money Christopher owed.  Defendant later met Janet on her birthday, when Wendy brought her to Chicago.  According to defendant, Wendy called him to get directions after arriving in Chicago.  He met them at a gas station.  He had no drugs to sell and did not engage in such a transaction.  He later called Janet because he was interested in her.  They continued a relationship and they once had sexual relations in a hotel room.

Defendant claimed that when Christopher was arrested, Wendy called and asked defendant to pay back some money that he owed Christopher.  Defendant indicated that Christopher lent him $5,000 for a building investment.  Defendant still owed $3,000 on the loan.  Defendant explained that, although Christopher owed defendant approximately $13,000 in money for the car deals, the building loan was an entirely separate transaction.  Defendant did not pay Wendy the money owed to Christopher.  Wendy, however, was insistent that defendant help with money.  She told him that she could get rid of cars quickly to some men from Lansing.  Defendant agreed to try and get some cheap cars for Wendy to sell for bail money.  Defendant attempted to explain the language from the recorded telephone calls, claiming that it related to the sale of vehicles and not drugs.  As previously noted, defendant could not explain the reference to price per "OZ" in the conversation.  Defendant also maintained that each of the prosecution witnesses lied about his involvement with cocaine.

Like Brenda, Wendy testified that the car sales were a front.  Defendant did not send Luis to pick up money for cars and she was not a part of any automobile dealing with defendant.  The only association she and Janet had with defendant related to drugs.  Wendy admitted that defendant sold cars as a sideline to his employment with a building maintenance company.  She also admitted that defendant sold numerous cars to Christopher.  Wendy testified, however, that the car sales were designed to give her brother a legitimate business income.  Janet testified that Christopher never paid defendant cash for the cars but only paid after the cars were resold.  Soto denied ever delivering cars for defendant or ever being sent to Michigan to pick up money for cars or rent.

*Diaz*, No. 227045, 2002 WL 31450796 at *1-5 (Mich. App.).

### III.     Procedural Background

### A.     Direct Appeal

Petitioner was represented at trial by Attorney W. J. Wilkinson, who filed a claim of appeal for petitioner on May 1, 2000.  *Diaz*, No. 227045 (Mich. App.) (docket no. 32-1 at p. ID# 306).   On October 10, 2000, Attorney Wilkinson filed a 49-page appellate brief on petitioner's behalf, which raised five issues and two sub-issues:

I.     Did the trial court lack jurisdiction to try allegations as to conduct which occurred outside the State of Michigan in the circumstances of this case?

II.     Did the trial court err in refusing to grant the defense request for a mistrial following improper and prejudicial hearsay and other evidence as to a separate and uncharged conspiracy?

Was defendant accordingly denied his state and federal due process right to a fair trial?

A.     Is the jury verdict duplicitous as a result of the admission of the testimony of Brenda Smith, requiring reversal?

Does the failure to properly instruct the jury also require reversal?

B.     Does admission of Brenda Smith's testimony at trial concerning other crimes evidence entitle defendant to a reversal of his conviction?

III.     Did the trial court err in refusing to instruct the jury that Carlos Reyes was a missing witness whose appearance was a responsibility of the prosecution and that the jury could infer the witness's testimony would have been unfavorable to the prosecution's case?

IV.     Was defendant denied his right of cross-examination and his constitutional right to confront his accusers when the trial court refused to allow defense counsel to inquire as to the sentence of a key prosecution witness?

8

V.   Was defendant deprived of his due process right to a fair trial when he was required to disclose the names of defense witnesses to the jury before trial?

(Brief) (docket no. 32-1 at pp. ID## 309-68).

Petitioner subsequently retained Attorney Keith G. Tatarelli to represent him on appeal.  In a "Motion to remand for an evidentiary hearing," Attorney Tatarelli advised the Court of Appeals, among other things: that after filing the appeal on behalf of petitioner, Attorney Wilkinson "was convicted of a felony extortion charge and suspended from the practice of law"; that Tatarelli now represents petitioner; and that an evidentiary hearing was necessary to determine whether "Attorney Wilkinson was operating under an actual conflict of interest that adversely affected his performance," and "whether [petitioner] was denied the right to effective assistance of counsel, inter alia, investigate, interview and prepare witnesses and/or present substantial defenses." Motion to Remand (docket no. 32-1 at pp. ID## 369-73).   The Michigan Court of Appeals denied the motion and affirmed petitioner's conviction.  *Diaz*, No. 227045 (Order) (Aug. 17, 2001) (docket no. 32-1 at p. ID# 374); (Opinion) (Nov. 1, 2002) (docket no. 32-1 at pp. ID## 290-305).

Petitioner filed a *pro se* delayed application for leave to appeal to the Michigan Supreme Court, which raised seven questions presented for review :

I.   Did Michigan have or obtain jurisdiction to prosecute defendant on a conspiracy to deliver cocaine charge where the offense occurred in the State of Indiana, no acts constituting conspiracy occurred in Michigan; Can agents of the government be conconspirators, and did the prosecution prove that **an actual detrimental effect** occurred in Michigan?

II.   Was it constitutionally permissible for the trial court to deny defendant's request for a mistrial where constitutional taint infected the fairness of the proceedings, and did the Court of Appeals reversibly err by affirming the trial court's decision?

9

III.   Did the trial and Court of Appeals reversibly err in finding that defendant was not entitled to an unanimous verdict or to have a properly instructed jury determine his guilt or innocence?

IV.   Did the trial and Appeals Court reversibly erred in finding that defendant was not entitled to a defense requested missing witness jury instruction?

V.   Was defendant denied his state and federal constitutional right to have the effective assistance of counsel for his defense?

  [A.   Counsel failed to pursue an interlocutory appeal.

   B.   Counsel failed to give an opening statement.

   C.   Counsel failed to conduct reasonable investigation.]

VI.   Was defendant denied due process and his constitutional right to effective assistance of counsel on direct appeal as of right?

VII.   Did the prosecutor commit reversible error when he withheld material, exculpatory evidence and failed to correct false-perjured testimony of its star witness?

  [A.   Discovery violation.

   B.   False-Perjured testimony.]

*People v. Diaz*, No. 122918 (Mich.) (docket no. 32-2 at pp. ID## 446-47, 455-56) (emphasis in original) (brackets added).  The Michigan Supreme Court denied the delayed application for leave to appeal.  *Id.* (Order) (July 28, 2003) (docket no. 32-2 at p. ID# 430).

**B.   Petitioner's motions for relief from judgment**

After his unsuccessful direct appeal, petitioner filed a motion for relief from judgment in the Branch County Circuit Court on May 24, 2004, raising the following issues:

I.   Defendant Diaz is serving a sentence that violates the prohibition against the imposition of "Cruel or Unusual Punishment" under Article I, Section 16 of the Michigan Constitution.

II.     Defendant Diaz was denied the effective assistance of (trial) counsel where (trial) counsel functioned under a conflict of interest, and failed: to seek an interlocutory appeal; give an opening statement; investigate and adequately prepare for trial; call witnesses; and, present exculpatory evidence in violation of U.S. Const. Ams. 5, 6 & 14; and, Mich. Const. Art. 1 §§ 17 & 20.

III.     Defendant Diaz was denied the effective assistance of appellate counsel on his appeal of right in violation of both the Michigan and United States Constitution. (Mich Const. Art 1 §§ 17 & 20; U.S. Const. Ams. 5, 6 & 14).

IV.     Application of the provisions of MCR 6.508(D)(3) are an unconstitutional limitation of this Court's statutory authority and defendant's rights under MCL 770.1 & 770.2.

Memorandum of law in support of motion for relief from judgment (docket no. 27).

Over one year later, on May 31, 2005 petitioner filed supplemental authority in support of Issue I of his motion for relief from judgment and sought to amend his motion to include an additional constitutional violation as part of Issue I:

Mr. Diaz's sentence violates the equal protection clause of the laws under U.S. Const. Am. XIV, § 1; Const 1963, Art 1 & 2. . . . There is no rational explanation for the Legislature's decision to require Mr. Diaz to continue serving a mandatory sentence where more severe conduct is being punished in a less severe manner, with the only differentiating factor being, when the offense was committed. The issue of timing does not constitute a rational basis for the imposition of disparate sentences.

*See* Motion to supplement (docket no. 32-3 at p. ID# 825) (emphasis in original).[2]

On June 30, 2005, petitioner filed a second "motion to supplement" Issue I to add the following (in his words):

Mr. Diaz would like to supplement issue one again, due to the fact that a new published opinion has just held that the punishment and a substantial and compelling

---

[2] Respondent sometimes refers to petitioner's motions to supplement his motion for relief from judgment on the date that petitioner signed the respective motions. For the sake of consistency, the Court will refer to the motions when they were filed stamped in the state court.

reason for a downward departure in Mr. Diaz' sentence.  Mr. Diaz maintains that under the facts of this case, and the unusual circumstances, the penalty is unconstitutional as it stands since the law has changed.

Motion to supplement (docket no. 32-4 at pp. ID## 839-40).

On July 7, 2005, petitioner filed a third supplement, moving to add a new ground to his motion for relief from judgment identified:

> V.      Defendant Diaz must be resentenced where the sentencing judge was under the misapprehension of law that a conviction for conspiracy with intent to deliver between 225 and 649 grams of cocaine allowed for a fine to be imposed in the sum of $10,000.00.

Motion to add a new ground (docket no. 32-5 at p. ID# 842).

On August 4, 2005, petitioner submitted a fourth supplement which sought to amend issue V (in his words):

> V.      Defendant Diaz must be resentenced where the sentencing judge was under the misapprehension of law that a conviction for conspiracy with intent to deliver between 225 and 649 grams of cocaine allowed him no discretion but to fine to be imposed in the sum of $10,000.00.

Supplemental Argument (docket no. 32-6 at p. ID# 847) (emphasis in original).

On August 23, 2005, petitioner filed a fifth supplement, consisting of "supplemental authority" advising the Branch County Circuit Court of a federal decision, *Rugiero v. United States*, 330 F. Supp.2d 900 (E.D. Mich. 2004), which petitioner felt supported his Issues II and III.  *See* Supplemental Authority (docket no. 32-7).

Judge Cherry appointed Attorney Chari K. Grove of the State Appellate Defender Office to pursue these post-trial claims.  *People v. Diaz*, Branch Co. Cir. Ct. No. 98-066617-FH (Case Register of Actions, Line 102) (docket no. 10).  On September 18, 2006, petitioner, through

Attorney Grove, filed a "supplemental motion for relief from judgment" which superseded plaintiff's earlier motions and raised three issues:

I.    Defendant was denied his right to effective assistance of trial and appellate counsel by a conflict of interest that pitted his attorney's personal interests against his own. US Const Am VI, XIV.

II.    Defendant's conviction for conspiracy to deliver cocaine must be reversed, where the jury instructions were inadequate to inform the jury that defendant must have specifically intended to deliver more than 224 grams of cocaine.

III.    The trial court abused its discretion in refusing to depart below the mandatory minimum term where objective, verifiable and substantial and compelling reasons existed to support a downward departure.

*See* Supplemental Motion (docket no. 32-8); Brief in support of supplemental motion (docket no. 32-8 at p. ID# 865).

Attorney Grove presented the September 18, 2006 motion for relief from judgment at a hearing held on August 30, 2007. *See* Motion Trans. (docket no. 25 at pp. ID## 171-85). At the conclusion of the hearing, Judge Cherry granted petitioner a new trial based upon a *presumption* that his former counsel, Attorney Wilkinson, provided ineffective assistance:

The fact of the matter is that I think the record is clear that at some point after he had undertaken Mr. Diaz's appeal, Mr. Wilkinson [petitioner's counsel] was charged with a crime of extortion, not in this county but in his home county of Kalamazoo, two counties over. Subsequently was convicted and sentenced on that and as a result lost his ability to practice law. By the testimony of Mr. Diaz and his sister, I think the record is abundantly clear that Mr. Wilkinson never made known to them the fact that he was facing difficulties of his own. Mr. Diaz indicated that had he done so, it is quite likely he would not have chosen Mr. Wilkinson to represent him. This withholding of information according to Mr. Diaz continued even after his conviction in this court when Mr. Wilkinson prevailed upon him to allow him to represent him on appeal. And I suppose it goes without saying that one issue not raised on appeal by Mr. Wilkinson was the issue of ineffective assistant [sic] of trial counsel, not surprisingly. Only when Mr. Diaz apparently called Mr. Wilkinson to learn if he had filed the brief on the court -- on his behalf on [sic] the court of appeals, did Mr. Wilkinson inform him that he had done so, but he would

13

not be able to represent him further as he had been convicted and lost his license to practice law and apparently sent to Mr. Diaz in prison all of the paperwork related to his case.

Mr. Diaz apparently undertook then to seek other representation and found another appellant [sic] attorney who apparently filed supplemental pleadings in the court of appeals in addition to the brief that Mr. Wilkinson had filed on his behalf. Obviously, the pleadings by both attorneys were unsuccessful as the court of appeals subsequently confirmed this Court's decisions and affirmed Mr. Diaz's conviction. That issue was not one that the court of appeals was invited to address either by Mr. Wilkinson himself or the attorney who undertook to represent Mr. Diaz in the court of appeals, and so it was indeed an issue that was properly before this Court on the motion for relief from judgment.

\*     \*     \*

*Turning back to the question of Mr. Wilkinson's having failed to advise Mr. Diaz of the pending criminal case that he had in Kalamazoo County up until his conviction and having been relieved of his bar license, the Court in this case is going to determine that that did in fact constitute ineffective assistance of counsel; that as an attorney, he had an obligation to inform Mr. Diaz of his circumstances; that the failure to do so was material breach and a prejudicial breach that must be presumed by this Court to be so egregious as to require a new trial in this matter.* . .

Motion Trans. at pp. 46-48, 51-52 (ID## 183-84) (emphasis added).  In addition, Judge Cherry stated on the record that he denied petitioner's other issues raised in the motion for relief from judgment.  *Id.* at pp. 49-51 (ID ## 183-84).  Judge Cherry entered an order that same date, granting the motion for relief from judgment "on the basis of ineffective assistance of counsel" and ordering "that the Defendant's conviction is vacated and the matter shall be set for a new trial."  Branch County Cir. Ct. (Order) (Aug. 30, 2007) (docket no. 32-11 at p. ID# 941).

### C.    The prosecutor's appeal in case no. 280753

On September 20, 2007, the prosecutor appealed that portion of the trial court's order granting a new trial, by filing an "Application for leave to appeal or for peremptory reversal" with the Michigan Court of Appeals.  This application raised one issue:

14

A defendant alleging a conflict of interest requiring reversal must demonstrate actual prejudice caused to him by his attorney's being charged with a criminal offense while representing defendant without informing defendant of this fact. Where, as here, the trial court after holding an evidentiary hearing, held that none of defendant's trial attorney's actions during trial were constitutionally ineffective, but rather held that prejudice must be presumed merely because trial counsel breached his duty to inform defendant of the pending criminal charge, did the trial court err as a matter of law by failing to find actual prejudice as a result of the breach of the duty to inform his client?

Prosecutor's Application for leave to appeal. *See People v. Diaz*, No. 280753 (Mich. App.) (docket

no. 18).

Petitioner filed an "Answer in opposition to application for leave to appeal" which

characterized the issue on appeal as involving an abuse of discretion:

Did the trial court not abuse its discretion or err as a matter of law in granting defendant a new trial based on a serious conflict of interest?

Petitioner's Answer in opposition. *Id.*

The Michigan Court of Appeals reversed Judge Cherry's grant of relief by issuing

an order in lieu of granting the application for leave to appeal:

Pursuant to MCR 7.205(D)(2), in lieu of granting the application for leave to appeal, the Court orders that the decision of the trial court granting defendant relief from judgment is PEREMPTORILY REVERSED and that the August 30, 2007 order effectuating the trial court's decision is VACATED. The trial court erred as a matter of law when it presumed prejudice and abused its discretion in granting relief where defendant failed to establish that an actual conflict of interest adversely affected his lawyer's performance. *People v. Smith*, 456 Mich. 543, 556-557; 581 N.W.2d 654 (1998). This order has immediate effect. MCR 7.215(F)(2). We do not retain jurisdiction.

*Id.* (Order) (Oct. 23, 2007).

In reaching this result, the Michigan Court of Appeals relied on the Michigan

Supreme Court's decision in *People v. Smith*, 456 Mich. 543 (1948), which, in turn, relied on federal

law established by the United States Supreme Court regarding situations in which an attorney's

15

conflict of interest can be presumed to be ineffective assistance of counsel. The *Smith* decision

provided in pertinent part:

> Defendant asks that we presume a conflict of interest exists whenever an attorney is
> being prosecuted in the same county as a criminal defendant whom he represents.
> We decline to create such a rule and hold instead that in order to demonstrate that a
> conflict of interest has violated his Sixth Amendment rights, a defendant "must
> establish that an actual conflict of interest adversely affected his lawyer's
> performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d
> 333 (1980).

*Smith*, 456 Mich. 543, 556, 581 N.W.2d 654 (1998).

On November 9, 2007, petitioner, through Attorney Grove, sought additional review

by filing an application for leave to appeal to the Michigan Supreme Court raising (somewhat

awkwardly) the following issue:

> Did the trial court not abuse its discretion or err as a matter of law in granting
> defendant a new trial based on a serious conflict of interest?

*See People v. Diaz*, No. 135237 (Mich.) (docket no. 19).  On April 28, 2008, the Michigan Supreme

Court denied petitioner's application for leave to appeal "because defendant has failed to meet the

burden of establishing entitlement to relief under MCR 6.508(D)." *Id.* (Order) (April 28, 2008).

### D.   Petitioner's appeal in case no 282121

On November 26, 2007, while the Michigan Court of Appeals Order of peremptory

reversal in case no. 280753 was pending before the Michigan Supreme Court, petitioner, through

Attorney Grove, filed a delayed application for leave to appeal to the Michigan Court of Appeals

in case no. 280753.  However, the Michigan Court of Appeals construed the delayed application as

a new appeal and assigned it case no. 282121.  *See People v. Diaz*, No. 282121 (Mich. App.) (docket

no. 32-11); Delayed Application and Order (docket no. 32-11 at pp. ID## 902-03).  In the delayed

application, petitioner, through counsel, raised the following issues:

16

I.      Was defendant denied his right to effective assistance of trial and appellate counsel by a conflict of interest that pitted his attorney's personal interests against his own.  US CONST AM VI, XIV?

II.     Must defendant's conviction for conspiracy to deliver cocaine be reversed, where the jury instructions were inadequate to inform the jury that defendant must have specifically intended to deliver more than 225 grams of cocaine?

III.    Did the trial court abuse its discretion in refusing to depart below the mandatory minimum term where objective, verifiable and substantial and compelling reasons existed to support a downward departure?

*Id.* (docket no. 32-1 at p. ID# 904).

Petitioner's delayed application did not list any sub-issues with respect to his claim that trial counsel was ineffective due to a conflict of interest.  However, the delayed application included five additional arguments related to ineffective assistance of counsel: (1) "Counsel was ineffective in failing to produce defense witnesses"; (2) "Counsel was ineffective in failing to impeach the star prosecution witness"; (3) "Counsel was ineffective in failing to file an interlocutory appeal"; (4) "Counsel was ineffective in failing to deliver an opening statement"; and (5) "Counsel was ineffective on appeal".  *See* Petitioner's Delayed Application (docket no. 32-11 at pp. ID## 916-25).[3]  The Michigan Court of Appeals denied the delayed application "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *Diaz*, No. 282121 (Order) (June 4, 2008) (docket no. 32-11 at p. ID# 902).

Petitioner raised the same three issues in his application for leave to appeal to the Michigan Supreme Court.  *See People v. Diaz*, No. 136755 (Mich.) (Application) (docket no. 32-12 at pp. ID##  943-81).   The application also included the five additional arguments for ineffective

_____

[3] The Court notes that while Judge Cherry addressed the ineffective assistance of counsel arguments (1), (2), (3) and (5), he did not address argument (4).

assistance of counsel, but did not identify these as discrete issues or sub-issues.  The Michigan

Supreme Court denied the application because petitioner "failed to meet the burden of establishing

entitlement to relief under MCR 6.508(D)."  *Id.* (Order Nov. 25, 2008) (docket no. 32-12 at p. ID#

942).

### E.    The habeas petition

On July 2, 2009, Diaz, through counsel, filed his habeas petition in this Court raising

two issues:

> I.    The Michigan Court of Appeals' order reversing the trial court's decision to
> grant a new trial was contrary to, and involved an unreasonable application of clearly
> established federal law, as determined by the Supreme Court of the United States.
> The trial court did not abuse its discretion or err as a matter of law in granting
> petitioner a new trial based on a serious conflict of interest, but unreasonably applied
> *Strickland v. Washington* in failing to find that counsel otherwise deprived petitioner
> of his right to effective assistance of counsel.  US Const Am VI, XIV.

> II.    Omission of knowledge as an element of the conspiracy charge violated
> petitioner's due process right to have the jury determine every element of the
> offense; defendant's conviction for conspiracy to deliver cocaine must be reversed
> where the jury instructions were inadequate to inform the jury that defendant must
> have specifically intended to deliver more than 225 grams of cocaine; trial counsel
> was ineffective in failing to object to the instructions, and appellate counsel was
> ineffective in failing to raise this issue in the direct appeal.  US Const Am V [sic],
> XIV.

Petition (docket no. 1).  The petition was vague with respect to the state court history, due in part

to petitioner's failure to include the case numbers of his various state court judicial proceedings.

However, now that the Court has obtained what appears to be a complete record of petitioner's state

court criminal proceedings, it is in a position to address the merits of those claims.

## IV.    Procedural default

### A.    Legal standard

A threshold issue in this matter is whether some or all of petitioner's claims are barred by the operation of the procedural default doctrine.  Where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A procedural default "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice."  *Gray v. Netherland*, 518 U.S. 152, 162 (1996).  Not every state procedural rule will warrant application of the procedural default doctrine.  Only a procedural rule that was "'firmly established and regularly followed' by the time as of which it [was] to be applied,"  *Ford v. Georgia*, 498 U.S. 411, 424 (1991), will support application of the doctrine.  "For a habeas claim to be procedurally defaulted on the basis of a state procedural rule, the petitioner must have violated a procedural rule, but the state court must also have based its decision on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  Habeas review of a procedurally defaulted claim is precluded  unless petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that a failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

## B.     Discussion

### 1.     Issue I

Issue I involves claims of ineffective assistance of counsel raised in case no. 280753 (conflict of interest) and in case no. 282121 ( failure to produce defense witnesses, failure to impeach the star prosecution witness, failure to file an interlocutory appeal, failure to deliver an opening statement, and ineffective assistance on appeal).  It does not appear to this court that Issue I is procedurally defaulted.  The Sixth Circuit has previously held that MCR 6.508(D) is a valid procedural bar for habeas purposes and that the doctrine of procedural default applied when the Michigan appellate courts cited that rule in an order denying an application for leave to appeal.  *See, e.g., Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002); *Simpson*, 238 F.3d at 407-08; *Luberda v. Trippett*, 211 F.3d 1004, 1008 (6th Cir. 2000).  However, in *Guilmette v. Howes*, 624 F.3d 286, 288 (6th Cir. 2010) (*en banc*), the Sixth Circuit held that brief orders which cite only MCR 6.508(D) -  i.e., the type of orders entered by the Michigan Court of Appeals and the Michigan Supreme Court in this case - "are not explained orders invoking a procedural bar."  In reaching this determination, the court observed that "Michigan practice confirms that brief orders citing Rule 6.508(D) in some cases refer to a petitioner's failure to meet his burden on the merits."  *Guilmette*, 624 F.3d at 291.  "Because the form orders in this case citing Rule 6.508(D) are ambiguous as to whether they refer to procedural default or denial of relief on the merits, the orders are unexplained."  *Id.*  Thus, courts "must look past such orders 'to the last reasoned state court opinion to determine the basis for the state court's rejection' of a petitioner's claim."  *Skinner v. McLemore*, 425 Fed.Appx. 491, 495 (6th Cir. 2011), quoting *Guilmette*, 624 F.3d at 291.

20

The last reasoned decision on Issue I (ineffective assistance of counsel due to conflict of interest) is the Michigan Court of Appeals' order of peremptory reversal entered on October 23, 2007. This order, though short, addressed the merits of this claim. *See Skinner*, 425 Fed.Appx. at 495; quoting *Guilmette*, 624 F.3d at 291. The last reasoned decision on the five additional claims of ineffective assistance of counsel is the Branch County Circuit Court's oral opinion and written order entered on August 30, 2007. Because the last reasoned decision of the state courts addressed the merits of the ineffective assistance of counsel claims raised in Issue I, these claims are not subject to the procedural default doctrine.

### 2. Issue II

After a further review of the record, the Court concludes, as it did in the original R&R, that Issue II is procedurally defaulted. At the motion hearing, Judge Cherry found that petitioner could have raised the "specific intent" issue with respect to the amount of cocaine involved in the conspiracy in his direct appeal:

> I mentioned briefly before the other argument regarding the absence of the specific intent instruction. As mentioned in chambers to both attorneys, normally I will wind up giving the instruction even at times when it may not be warranted, recognizing that some crimes are specific intent crimes by definition; others have semblances of the same. And often I find that it is simply safer to give the instruction. In this particular case, I do not see that it was reversible error to have failed to do so. Again, that was an issue that could have been raised in the court of appeals. Was not and the Court would determine that it had been therefore waive [sic].

Motion Trans. (docket no. 25 at p. ID# 184). Petitioner's failure to raise this issue on his direct appeal constituted a procedural default pursuant to MCR 6.508(D)(3), which provides in pertinent part that:

> The court may not grant relief to the defendant if the motion . . . (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on

21

appeal from the conviction and sentence or in a prior motion under this subchapter
[.]

MCR 6.508(D)(3).

Habeas review of a procedurally defaulted claim is precluded unless petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that a failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "[T]he existence of cause for a procedural default must turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Here, petitioner has asserted ineffective assistance of appellate counsel as both cause to excuse the default and as an independent claim. However, as discussed in §§ VI.A. and VI.F., *infra*, petitioner's appellate counsel was not constitutionally ineffective.

Petitioner's failure to demonstrate cause prevents federal habeas review of this Issue unless the court's failure to do so will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In *Schlup v. Delo*, 513 U.S. 298, 321 (1995), the Supreme Court described the scope of the fundamental miscarriage of justice exception:

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, the Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

To meet the threshold requirement for actual innocence, a petitioner must persuade the court "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329. In the procedural default context, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24 (1998).

"To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner offers no such new evidence that he is actually innocent of the crime for which he was convicted. He has failed to meet the fundamental miscarriage of justice exception. Accordingly, petitioner's claim raised in Issue II is procedurally barred and not subject to federal habeas review.

## V.      Standard of review under 28 U.S.C. § 2254

Petitioner seeks relief under 28 U.S.C. §2254, which provides that "a district judge shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Before petitioner may seek such relief in federal court, she must first fairly present the substance of her claims to all available state courts, thereby exhausting all state remedies. *Picard v. Connor*, 404 U.S. 270, 277-78 (1981); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994); *see* 28 U.S.C. §2254(b)(1)(A). In the present case, petitioner has exhausted his state remedies with respect to his habeas claims.

Where the state court has adjudicated a claim on its merits, the federal district court's habeas corpus review is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides in pertinent part that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

23

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 776, 773 (2010) (internal quotation marks and citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* The AEDPA's deferential standard "requires Petitioner to show 'the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing [Supreme Court precedent] beyond any possibility for fairminded disagreement.'" *Blackmon v. Booker*, 696 F.3d 536, 538 (6th Cir. 2012), quoting *Harrington*, 131 S. Ct. at 786-87. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786. "If this standard is difficult to meet, that is because it was meant to be." *Id.*

Under the "contrary to" clause of § 2254(d)(1), "a federal habeas court may grant the writ only if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts." *Jalowiec v. Bradshaw*, 657 F.3d 293, 301 (6th Cir. 2011), citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause of § 2254(d)(1), "a federal court may grant the writ only if the state court

24

identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case." *Id*.  A court may not issue a writ of habeas corpus "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.  Rather, to grant habeas relief, the state court's application of the law must be found to be "objectively unreasonable." *Id.* at 409.

A determination of a factual issue by a state court is presumed to be correct.  28 U.S.C. § 2254(e)(1).  A habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence that the state court's determination was erroneous.  *Magana v. Hofbauer*, 263 F.3d 542, 546-47 (6th Cir. 2001).  The presumption of correctness accorded to a state court's findings of fact on federal habeas review also applies to the factual findings of a state appellate court based on the state trial record.  *Brumley v. Winegard*, 269 F.3d 629 (6th Cir. 2001).

## VI.   Discussion

### A.  Ineffective assistance due to conflict of interest

In the original R&R, the undersigned found that Issue I, as presented by the parties, was limited to a claim of ineffective assistance of counsel for an alleged conflict of interest.  After reviewing the additional materials submitted by the parties, the undersigned finds no reason to change the analysis of the conflict of interest claim on remand.  Accordingly, the undersigned adopts § IV of the original R&R with respect to petitioner's claim of ineffective assistance of counsel due to a conflict of interest:

### A.        Ineffective assistance of trial counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court set forth a two-prong test to determine whether counsel's assistance was so defective as to require reversal of a conviction: (1) the defendant must show that counsel's

25

performance was deficient and (2) the defendant must show that counsel's deficient performance prejudiced the defense, i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687. In making this determination, the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential, and the court is to presume that counsel rendered adequate assistance and made decisions with reasonable professional judgment. *Id.* at 689-690. "[T]he threshold issue is not whether [petitioner's] attorney was inadequate; rather, it is whether he was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (emphasis in original), *cert. denied* 508 U.S. 975 (1993).

As a general rule, a defendant alleging a Sixth Amendment violation must demonstrate prejudice. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). An exception to this general rule exists "where assistance of counsel has been denied entirely or during a critical stage of the proceeding" because "[w]hen that has occurred the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Id.* In such cases, the courts "have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect." *Id.* This presumption of prejudice applies only in "circumstances of that magnitude," which may "arise when the defendant's attorney actively represented conflicting interests." *Id.*

Here, petitioner contends that the trial court correctly presumed that his counsel was *per se* constitutionally ineffective due to a conflict of interest, because counsel was involved in his own unrelated criminal proceedings at the same time he represented petitioner's criminal proceedings. The court disagrees. In *Mickens*, the Supreme Court traced the origins of the so-called "automatic reversal" rule which applies when defense counsel faces a disabling conflict:

> In *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), defense counsel had objected that he could not adequately represent the divergent interests of three codefendants. *Id.*, at 478–480, 98 S.Ct. 1173. Without inquiry, the trial court had denied counsel's motions for the appointment of separate counsel and had refused to allow counsel to cross-examine any of the defendants on behalf of the other two. The *Holloway* Court deferred to the judgment of counsel regarding the existence of a disabling conflict, recognizing that a defense attorney is in the best position to determine when a conflict exists, that he has an ethical obligation to advise the court of any problem, and that his declarations to the court are "virtually made under oath." *Id.*, at 485–486, 98 S.Ct. 1173 (internal quotation marks omitted). *Holloway* presumed, moreover, that the conflict, "which [the defendant] and his counsel tried to avoid

26

by timely objections to the joint representation," *id.*, at 490, 98 S.Ct. 1173, undermined the adversarial process.  The presumption was justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants "effectively sea[l] his lips on crucial matters" and make it difficult to measure the precise harm arising from counsel's errors.  *Id.*, at 489–490, 98 S.Ct. 1173.  *Holloway* thus creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict.  *Id.*, at 488, 98 S.Ct. 1173 ("[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic").

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the respondent was one of three defendants accused of murder who were tried separately, represented by the same counsel.  Neither counsel nor anyone else objected to the multiple representation, and counsel's opening argument at Sullivan's trial suggested that the interests of the defendants were aligned.  *Id.*, at 347–348, 100 S.Ct. 1708.  We declined to extend *Holloway*'s automatic reversal rule to this situation and held that, absent objection, a defendant must demonstrate that "a conflict of interest actually affected the adequacy of his representation."  446 U.S., at 348–349, 100 S.Ct. 1708.

*Mickens*, 535 U.S. at 167-68.

In *Strickland*, the Supreme Court took account of *Sullivan* in determining the prejudice prong applicable to a Sixth Amendment ineffective assistance of counsel claim.  After noting that prejudice is presumed in some Sixth Amendment contexts, such as the "[a]ctual or constructive denial of the assistance of counsel altogether" and "various kinds of state interference with counsel's assistance," the court referred to the presumption of prejudice in cases involving conflicts of interest:

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice.  In *Cuyler v. Sullivan*, 446 U.S., at 345–350, 100 S.Ct., at 1716–1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest.  In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties.  Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.  Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.*, Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice

27

system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.  Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, *supra*, 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

*Strickland*, 466 U.S. at 692.

The Sixth Circuit has construed *Strickland* and *Sullivan* as limiting the presumption of prejudice to those instances in which the defendant demonstrates an actual conflict of interest adversely affects his lawyer's performance.  *See, e.g., Jalowiec v. Bradshaw*, 657 F.3d 293, 317 (6th Cir. 2011) (in reviewing *Sullivan* and *Strickland*, the court observed that prejudice is presumed where counsel was burdened by an actual conflict of interest, but only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance); *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993) (court rejected the defendant's claim that a *per se* conflict of interest that violated his rights under the Sixth Amendment to the United States Constitution where counsel was indicted five days after criminal defendant's trial, noting that the defendant "has the burden of demonstrating that counsel's activity represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance" and that "[t]his court specifically has rejected a *per se* rule as to conflicts of interest and requires proof of an actual conflict").  Furthermore, the Sixth Circuit has limited application of "*per se* prejudice" to cases involving an attorney's representation of multiple criminal co-defendants.  *See Smith v. Hofbauer*, 312 F.3d 809, 818 (6th Cir. 2002) (the Sixth Circuit held that there is no clearly established law that the *Sullivan* rule of *per se* prejudice extends to any type of conflict of interest except for an attorney's joint representation of criminal defendants). [FN 7]

> [FN 7]   The court notes that the Sixth Circuit's opinion in *Smith v. Hofbauer*, 312 F.3d 809, involved a federal habeas action arising from *People v. Smith*, 456 Mich. 543, the decision which the Michigan Court of Appeals relied on in reversing the trial judge in the present case.

Here, petitioner's alleged conflict of interest did not involve counsel's representation of multiple criminal defendants.  Furthermore, petitioner did not demonstrate that the alleged actual conflict of interest, i.e., counsel's own criminal prosecution in a different county, adversely affected counsel's performance in petitioner's case.  *See Strickland*, 466 U.S. at 692; *Cuyler*, 446 U.S. at 348, 350.  The

Michigan Court of Appeals properly reversed the trial court's decision, which simply assumed prejudice in the absence of evidence that an actual conflict of interest adversely affected counsel's representation of petitioner.  *See Mickens*, 535 U.S. at 173 ("[t]he trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable").

The state court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254 (d).  Accordingly, petitioner is not entitled to relief on this claim.

### B.      Ineffective assistance of appellate counsel

Finally, petitioner seeks to overcome the procedural default of Issue II . . . by asserting that appellate counsel was ineffective due to conflicts of interest (1) arising from his own criminal proceedings and (2) because counsel represented petitioner at both the trial and appellate levels.  As with trial counsel, appellate counsel enjoys a strong presumption that the alleged ineffective assistance falls within the wide range of reasonable professional assistance.  *See Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003).  It is not necessary for appellate counsel to raise every non-frivolous claim on direct appeal.  *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes,* 463 U.S. 745 (1983).

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.

*Jones*, 463 U.S. at 751-52.   It is well-recognized that the effect of adding weak arguments to an appellate brief "will be to dilute the force of the stronger ones." *Id.* at 752, *quoting* R. Stern, *Appellate Practice in the United States* 266 (1981).

When evaluating the issue of ineffective assistance of appellate counsel, prejudice is shown if  there is a reasonable probability that, but for his counsel's failings, the defendant would have prevailed on his appeal.  *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009), citing *Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir.2004).  A "reasonable probability" is a probability sufficient to undermine the court's confidence in the outcome.  *Id.* at 564-65.  To evaluate a claim of ineffective assistance of appellate counsel, the court assesses the strength of the claim appellate counsel failed to raise.  *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir.2004).  Thus, appellate counsel cannot be found to be ineffective for failing to raise an issue that lacks merit.  *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010); *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

1.      **Conflict of interest due to counsel's own criminal
        proceedings**

As discussed . . . the conflict of interest arising from trial counsel's own
criminal proceedings does not establish *per se* prejudice establishing an ineffective
assistance of counsel claim.  For these same reasons, counsel's own criminal
proceedings did not create *per se* prejudice with respect to his claim of ineffective
assistance of appellate counsel.  Furthermore, to the extent that petitioner claims
appellate counsel was ineffective for failing to raise his claim that trial counsel was
ineffective due to a conflict of interest,  appellate counsel cannot be ineffective for
failing to raise a claim which lacked merit. *Willis*, 351 F.3d at 745; *Greer v. Mitchell*,
264 F.3d 663, 676 (6th Cir. 2001).

2.      **Conflict of interest due to counsel's representation
        at both the trial and appellate levels**

With respect to his second claim of ineffective assistance, petitioner relies on
*Nichols v. United States*, 75 F.3d 1137 (7th Cir. 1996) for the proposition that "[i]t
has been recognized that an attorney who represents a defendant at both trial and on
appeal is potentially in conflict with his own interest and unlikely to raise ineffective
assistance against himself."  Petitioner's Reply Brief at p. 4.  The court disagrees
with the significance which petitioner has attached to the *Nichols* opinion.  In
*Nichols*, the Seventh Circuit observed that because the criminal defendant was
represented by the same attorney at both the trial and appellate level, the defendant
was allowed to raise an ineffective assistance of counsel claim on collateral attack.
*Nichols*, 75 F.3d at 1141.  This court has noted that under Michigan's Court Rules,
a habeas petitioner - whether represented on appeal by trial counsel or different
appellate counsel - is typically unable to raise and exhaust an ineffective assistance
of appellate counsel claim until the appeal is denied, with his first opportunity being
a motion for relief from judgment under MCR 6.500 *et seq. See, e.g., Chu v. Harry*,
No. 1:06-cv-614, 2009 WL 3151235 at *6 (W.D. Mich. Sept. 29, 2009) (noting that
collateral review under MCR 6.500 *et seq.* was the first opportunity for the criminal
defendant to address the issue of ineffective assistance of appellate counsel).  In
essence, petitioner is seeking another claim of *per se* prejudice due to the alleged
conflict of interest arising from counsel's representation of petitioner at the trial and
on appeal.  The Sixth Circuit rejected this theory in *Whiting v. Burt*, 395 F.3d 602
(6th Cir. 2005):

> The *Sullivan* standard has been applied by the Supreme Court only in
> cases, like those involving multiple concurrent representation, where:
> (1) prejudice was obvious, e.g., a denial of the assistance of counsel,
> or where there was a 'high probability of prejudice;' and (2) it was
> difficult to prove that prejudice.  Neither of these factors has any
> application to the rather common occurrence of trial counsel also
> acting as counsel on direct appeal.  That situation, in itself, does not
> create any obvious prejudice.  Furthermore, there is no comparable
> difficulty in proving whether counsel was ineffective at the appellate
> level for failing to raise an ineffective assistance of trial counsel
> claim.

*Whiting*, 395 F.3d at 619 (internal citation and footnote omitted).

Finally, to the extent that petitioner's reply raises conclusory claims of ineffective assistance by substitute counsel on appeal (e.g., "[w]hile substitute [appellate] counsel filed a motion to remand, which was denied, he failed to thereafter file a brief on appeal raising the ineffective assistance of counsel issue" and both appellate attorneys failed to raise "any sentencing issues on appeal" or "the instructional issue"), *see* Petitioner's Reply Brief at p. 5, such unsupported allegations of ineffective assistance of counsel fails to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. *See Fountain v. United States*, 211 F.3d 429, 435 (7th Cir. 2000) (unsupported assertions which fail to direct the court to "specific actions or omissions" to form the basis of an ineffective assistance of counsel claim "fail[] to overcome the heavy burden and presumption that his counsel was constitutionally effective") ; *United States v. DiTommaso*, 817 F.2d 201, 215 (2nd Cir. 1987) (court rejected claim of ineffective assistance of counsel where there was no basis for supporting the motion "[a]part from the bald assertion that a suppression motion in this case would have 'apparent viability'"). Accordingly, petitioner has failed to establish that his appellate counsel was constitutionally ineffective under the Sixth Amendment.

R&R (docket no. 24 at pp. ID## 145-52).

For the reasons stated above, petitioner's claim of ineffective assistance of trial and appellate counsel arising from a conflict of interest should be denied.

### B.     Counsel was ineffective in failing to produce defense witnesses

Petitioner contends that his trial counsel was ineffective for failing to call six defense witnesses: Jose Rosario; Mr. Edwin; Scott Palmateer; Chris Smith; Tainmy Williams; and Carlos Reyes.   Petitioner summarized the possible testimony of these six witnesses as follows.  Jose Rosario, was the owner of MJ Auto and "critical to Defendant's theory as he was the only witness to have first-hand knowledge of Defendant's used car business."  Petitioner's Brief (docket no. 2 at p. ID# 42).  Without citing any evidence, petitioner speculates that "Rosario could have testified to his extensive involvement in the used car business and that he never heard of nor seen Defendant involved in illicit drug activities." *Id.*  Similarly, petitioner makes the conclusory statement that his auto mechanic,  Mr. Edwin, "would have certified and explained the exact purpose and nature of Defendant's proposed exhibits #27 (car titles, bills of sale and repair bills)." *Id.*  Finally, with respect to Scott Palmateer, Chris Smith and Tainmy Williams, petitioner speculates that "[h]ad one,

31

any or all of these witnesses testified that Defendant was not a major drug dealer, but in fact, a simple car dealer, it could have had a fatal impact on the prosecution's case."

> Judge Cherry addressed this issue as follows:
>
> The fact that there were witnesses that Mr. Diaz has indicated that he made known to Mr. Wilkinson that he chose to not call as witnesses, again, is a matter of concern, but just as a trial attorney in my prior life in having great familiarity with the strategies and decisions of trial attorneys who appear in this court, quite often it is a matter of strategy, and I suppose hindsight being far more clearer than foresight, it can sometimes be questioned why witnesses such as those alluded to by Mr. Diaz today would not be called, but without additional information, the Court cannot find that that would constitute ineffective assistance of counsel.

Motion Trans. (docket no. 25 at p. ID# 184).

"[W]hether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit *Strickland* deference and are "virtually unchallengeable." *Rayborn v. United States*, 489 Fed.Appx. 871, 878 (6th Cir. 2012), quoting *Strickland*, 466 U.S. at 690. Counsel is not ineffective for resting without calling any of the witnesses identified by a criminal defendant, where none of the witnesses were relevant to the defense theory. *United States v. Kincaide*, 145 F.3d 771, 785-86 (6th Cir. 1998). Here, petitioner has not demonstrated that these witnesses were relevant or crucial to the defense strategy at trial. While petitioner contends that Attorney Wilkinson "did nothing other than present a jurisdictional defense," he admits that "a jurisdictional defense is a viable defense." Petitioner's Brief at p. ID# 42.[4]

Furthermore, while petitioner claims that Attorney Wilkinson was ineffective for failing to present these witnesses, he has not shown any prejudice from Wilkinson's failure to do so. Petitioner has not presented evidence of the proposed testimony nor has he explained a coherent defense theory which would incorporate such evidence. Obviously, a person selling old cars can also traffic in drugs. "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may

---

[4] The Court notes that petitioner does not maintain a consistent position with respect to the defense theory at trial. While petitioner takes the position that Attorney Wilkinson only presented a jurisdictional defense (Petitioner's Brief (docket no. 2) at p. ID# 42), petitioner later states that the "heart" of the defense theory at trial was that he was a "used car dealer" (Petitioner's Objections (docket no. 25) at p. ID# 163).

disserve the interests of his client by attempting a useless charade." *United States v. Cronic*, 466 U.S. 648, 657 n. 19 (1984).

In addition, the record reflects that Attorney Wilkinson aggressively defended petitioner at trial.  Attorney Wilkinson cross-examined and conducted voir dire on prosecution witnesses, and objected to portions of their testimony.  *See* Trial Trans. (Feb. 14, 2000) at pp. 159-62, 165-66, 171-73 (docket n.12); Trial Trans. (Feb. 15, 2000) at pp 5-26, 33-36, 54-64, 70-80, 82-84, 109-10, 133-51, 173-84, 188-91 (docket no. 13); Trial Trans. (Feb. 16, 2000) at pp. 123-24 (docket no. 14).  In addition, Attorney Wilkinson presented seven witnesses for the defense (Patrick Trunk, Frank Wieczorek,  Robert L. Thielke, Jr.,  Matthew Brettin, Maria Rivera, Alfredo Cortes and petitioner).  *See* Trial Trans. (Feb. 15, 2000); Trial Trans. (Feb. 16, 2000).  Finally, Attorney Wilkinson's closing argument addressed, in part, the credibility of the prosecution's witnesses.  *See* Trial Trans. (Feb. 16, 2000) at pp. 159-70.  Such actions are not indicative of ineffective assistance. *See, e.g., United States ex rel. Bradley v. Lane*, 834 F.2d 645, 649 (7th Cir. 1987) (defense counsel's failure to give an opening statement, failure to present witnesses and resting his case when the state completes its case-in-chief did not constitute ineffective assistance, where counsel made repeated objections at trial, vigorously cross-examined several key witnesses, moved for a directed verdict, and "gave what the state appellate court described as a persuasive closing argument" ). Accordingly, this claim of ineffective assistance should be denied.

### C.    Counsel was ineffective in failing to impeach the star prosecution witness

Petitioner contends that Attorney Wilkinson failed to impeach the prosecutor's star witness, Louis Soto, with evidence of a prior conviction.  At the hearing on the motion for relief from judgment, petitioner presented a document which indicated that Soto "was convicted of vehicle theft, criminal sexual conduct or sexual assault, several drug offenses, including possession of marijuana, and deceptive practices."  Petitioner's Brief at p. ID# 43.  This document, a report from the Illinois State Police, was identified as Defendant's Exhibit  No. 1.  *See* Illinois State Police Criminal History (attached to petitioner's answer to the application for peremptory reversal) (docket

no. 18). Petitioner contends, without citation to authority, that all of these prior convictions would be admissible because Soto was an accomplice. Petitioner's Brief at p. ID# 43. Petitioner then backed away from this contention by stating (again without citation to authority) that "[a]t the very least" the conviction of vehicle theft would have been admissible. *Id.*; Illinois State Police Criminal History (indicating that Soto was sentenced to 4 years imprisonment). Petitioner also stated (without citation to authority) that "if [Soto] was in fact convicted of" deceptive practices, such a conviction "would have been admissible" as impeachment evidence. Petitioner's Brief at p. ID# 43. In short, while petitioner contends that Attorney Wilkinson was ineffective for failing to produce evidence regarding Soto's criminal convictions, he provided neither court documents nor legal authority to support his claim that this particular document could have been used to impeach Soto. *See, e.g., People v. Cross*, 202 Mich. App. 138, 146, 508 N.W.2d 144 (1993) ("[a] witness' credibility may be impeached with evidence of prior convictions, M.C.L. § 600.2159; M.S.A. § 27A.2159, but only if the convictions satisfy the criteria set forth in MRE 609").

Judge Cherry did not find that petitioner's speculative impeachment claim rose to the level of a constitutional violation:

> Similarly, the fact that Mr. Rayus' [Reyes'] prior record or Mr. Soto's prior record more exactly was not brought before the jury for the purposes of impeachment may be questionable, but, again, the Court is hesitant to find in and of itself that that would be ineffective assistant [sic] of counsel.
>
> Going through Defendant's Exhibit Number 1 as indicated, a couple of those matters may have been used for the purposes of impeachment. Ms. Grove has argued that as a coconspirator more may have been, but, again, I'm not sure if that would have been sufficient to do so, and, again, the Court will not find that to have been ineffective assistant [sic] of counsel.

Motion Trans. at p. ID# 184. Under these facts, petitioner has not demonstrated that Attorney Wilkinson was deficient for failing to impeach Soto based upon this criminal history.

In addition, petitioner has not demonstrated prejudice. While petitioner characterized Soto as the prosecution's "star" witness, the record reflects that Soto was only one of 12 prosecution witnesses who testified in the government's case in chief. Other witnesses gave very damaging testimony against petitioner. For example, as discussed, Wendy Smith testified that she spoke with

34

petitioner over the telephone to arrange a sale of cocaine, that she met with petitioner 20 or 30 times in Chicago, and that petitioner gave her cocaine to transport to Michigan. *See* Trial Trans. (Feb. 14, 2000) (docket no. 12); Trial Trans. (Feb. 15, 2000) (docket no. 13); and Trial Trans. (Feb. 16, 2000) (docket no. 14). *See also, People v. Diaz*, 2002 WL 31450796 at *1-5 (Mich. App.) (summarizing the prosecution's witness testimony).

Furthermore, the jury *was* aware that Soto had a criminal history and was incarcerated. The record reflects that Soto testified that he had been convicted of a crime, was currently in custody at the Branch County Jail, and that he had entered into a plea agreement. Trial Trans. (Feb. 15, 2000) at pp. 157-58. The jury was aware that Soto received an enormous personal benefit for cooperating with the prosecution in this case and could have considered this in evaluating his testimony. On cross-examination, Attorney Wilkinson established: that at the time of the crimes, Soto had been on parole in Illinois for possession of a stolen automobile; that Soto's plea agreement with the Branch County prosecutor involved a charge of possession of 50 to 225 grams of cocaine; that as part of the agreement, a greater charge involving 225 to 650 grams of cocaine was dismissed; and that by cooperating with the prosecutor, Soto would receive a recommendation to serve a 7 year sentence rather than a 60 year sentence. Trial Trans. (Feb. 15, 2000) at pp. 181-82.

The jury could consider this evidence of Soto's criminal history, plea agreement and his status as an accomplice in evaluating his testimony. In this regard, Judge Cherry instructed the jury that in evaluating witness testimony, they could consider whether the witness had a reason to be untruthful:

> There is no fixed set of rules for judging whether you believe a witness, but it might help you again to think about these questions. . . Does the witness have any bias, prejudice or personal interest? Have there been any promises, threats, suggestions or other influences that might have affected the witness's testimony? In general, does the witness have any special reason to tell the truth or any special reason to lie? All in all, how reasonable does the witness's testimony seem when you think about all of the other evidence in the case?

Trial Trans. (Feb. 16, 2000) at pp. 180-81. In addition, Judge Cherry specifically instructed the jury on how to evaluate Soto's testimony because he was both an accomplice (e.g., "[y]ou should

35

examine an accomplice's testimony closely and be very careful about accepting it") and the recipient of an agreement with the prosecutor (e.g., "You've also heard testimony that Janet Palmateer and Luis Soto made an agreement with the prosecutor about the charges against them in exchange for their cooperation and testimony.  You are to consider this evidence only as it relates to their credibility and as it may show any bias or self-interest"),  *Id.* at pp. 183-84.

Based on this record, Attorney Wilkinson was not deficient with respect to presenting evidence of Soto's criminal history.  Furthermore, petitioner suffered no prejudice from Wilkinson's representation.  Petitioner's ineffective assistance claim should be denied.

### D.  Counsel was ineffective in failing to file an interlocutory appeal

Petitioner states that Attorney Wilkinson was ineffective for failing to file an interlocutory appeal after Judge Cherry granted Wilkinson's pre-trial motion to quash the charge of delivery, but allowed the conspiracy charge to proceed.  As an initial matter, the Court is hampered by petitioner's failure to provide citations to the state court record with respect to the motion to quash or to provide a coherent discussion of the state court's proceedings with respect to the motion. *See* Petitioner's Brief (docket no. 2 at pp. ID## 15 and 43).  However, after reviewing the most recently filed Rule 5 materials, the Court has reconstructed the procedural history as follows.

The felony information filed on January 26, 1998, charged petitioner with two counts.

Count 1 (conspiracy) charged that petitioner

> .  .  .  did, on or about March1997 through June 20, 1997, unlawfully conspire, combine, confederate and agree together with Louis Soto, Carlos Reyes, and/or other unnamed individuals to commit an offense prohibited by law, to wit: did deliver 225 grams or more but less than 650 grams of a mixture containing controlled substance, cocaine;  contrary to MCL 333.7401(1)(a)(ii);  MSA 14.15(7401)(2)(a)(ii). 333.74012A2; contrary to M.C.L. § 750.157(a); MSA 28.354(1). [333.74012A2] [C]

Information (docket no. 32-2 at p. ID# 581).

Count II (delivery/manufacture) charged that petitioner

> .  .  .  did, on or about June 10, 1997, deliver 225 grams or more but less than 650 grams of a mixture containing the controlled substance, cocaine.  contrary to MCL 333.7401(1)(a)(ii); MSA 14.15(7401)(2)(a)(ii).  [333.74012A2]

*Id.*

Petitioner was bound over to the Branch County Circuit Court on both counts   Prel. Exam.  (June 2, 1998) at p. 74 (docket no. 11); Branch County Cir. Ct. Docket Sheet (docket no. 10). The most recently filed Rule 5 materials include a copy of Attorney Wilkinson's motion to quash the bindover of both counts to the Branch County Circuit Court.  *See* Motion to Quash (docket no. 32-2 at pp. ID## 680-81).  The trial court denied the motion as to Count 1 (conspiracy) but granted the motion as to Count 2 (delivery), stating in pertinent part:

> The heart of Defendant's Motion is that most of the alleged actions attributed to him occurred in the states of Illinois and Indiana, save for phone calls to and from the individuals here in Michigan.  Looking at those facts in the light most favorable to the People, as this Court must do, it cannot find either a lack of jurisdiction or that the District Court Judge abused his discretion regarding Count 1.  Based upon *People v Blume*, 443 Mich 476 (1993), Defendant's extraterritorial acts, if proved, could sustain the proposition that he intended cause [sic] detrimental effects in the state of Michigan.  Further, the aggregate amount of controlled substances the Defendant is alleged to have conspired to deliver in Michigan over the time asserted is more than sufficient.  As to the charge of conspiracy in Count 1, therefore, this Court finds no basis for Defendant's Motion.
>
> Regarding Count 2, the allegation of Delivery of Cocaine, however, there has been produced no evidence showing that the Defendant actually delivered in Michigan any controlled substance, let alone the amounts alleged during the periods asserted.  While the logic of *Blume* may be sufficient in a conspiracy case it would have to be twisted beyond recognition to apply to an allegation of actual delivery. Where a defendant never actually delivers or participates in the delivery of controlled substances in this state he cannot be charged with their delivery.

Opinion and Order (Sept. 25, 1999) (docket no. 32-2 at pp. ID## 583-84).

At the hearing on the motion for relief from judgment, the trial court revisited this issue and concluded that an interlocutory appeal would have been essentially futile:

> [T]he fact that Mr. Wilkinson had brought a motion to quash, the Court dismissed the one count of delivery of the controlled substances but left in place the conspiracy charge.  While Mr. Wilkinson did not seek an interlocutory appeal on that, the Court does not view that similarly as a grounds for a new trial.  Again, recognizing the circumstances in the court of appeals where most usually they decline to accept interlocutory appeals until the case is done, leads me to believe that there would have been very little chance of success had Mr. Wilkinson had [sic] done so, and, therefore, the Court would not find that grounds for reversal or for order a new trial [sic].

*See* Motion Trans. (docket no.25 at pp. ID## 183-84).

While petitioner now contends that Attorney Wilkinson was constitutionally ineffective for failing to file an interlocutory appeal of this ruling, his supporting brief presented only a cursory discussion of this issue, stating:

> The trial court granted a pretrial motion to quash the charge of delivery, but allowed the conspiracy charge to proceed. Mr. Wilkinson did not appeal this decision. The essence of an ineffective assistance of counsel claim based on the failure to file a pre-trial, mid-trial or posttrial motion is whether the motion would have been successful. In the instant case, a successful motion to quash would have produced a different result. After being partially successful, defense counsel did not seek interlocutory review on the unsuccessful portion of his motion to quash. The trial court had correctly concluded that no evidence had been produced regarding the allegation of delivery of cocaine, but incorrectly concluded that Defendant's acts, "if proved," could sustain a conspiracy charge. The trial court's factual findings are clearly erroneous and should have compelled reasonably competent counsel to seek interlocutory review.

Petitioner's Brief at p. ID# 43.

Having failed to adequately present this issue in his brief, petitioner used his objections to the R&R as a vehicle to address the issue. *See* Objections at pp. ID## 206-08. Nevertheless, petitioner has not presented a coherent legal argument to demonstrate ineffective assistance of counsel. Petitioner's objections glossed over the legal standard applicable to presenting an interlocutory appeal in Michigan, simply stating that:

> An interlocutory appeal would not only have been appropriate in this particular case, but is specifically allowed by Michigan procedure. *People v Torres*, 452 Mich 43, 60-61; 549 NW2d 540 (1996); MCL 600.308; MSA 27A.308.

*Id.* at p. ID# 208.

The statute cited by petitioner, M.C.L. § 600.308 sets forth the jurisdiction of the Michigan Court of Appeals. At the time of petitioner's appeal, M.C.L. § 600.308(2)(e) provided that "The court of appeals has jurisdiction on appeal from the following orders and judgments that shall be reviewable only upon application for leave to appeal granted by the court of appeals: . . . (e) Any other judgment of interlocutory order as determined by court rule." In *Torres*, the Michigan Supreme Court stated that "the availability of an interlocutory appeal affords protection in those cases where an innocent accused should have been screened out by the preliminary examination process." *Torres*, 452 Mich. at 60-61 (internal quotation marks omitted). Here, Judge Cherry found

38

that, under the facts of this case, "there would have been very little chance of success" on an interlocutory appeal.

Petitioner also fails to address the fact that Attorney Wilkinson raised the jurisdictional challenge related to the bindover on direct appeal to the Michigan Court of Appeals, which that court rejected:

> Defendant first argues that he was improperly tried on the conspiracy charge. In a pretrial motion, defendant challenged Michigan's jurisdiction to try the charge. The trial court denied the jurisdictional challenge. Defendant challenges that ruling, arguing that the conspiracy was to deliver cocaine to Indiana, not Michigan, and that acts committed outside of the state cannot be tried within the state even if the acts are intended to, and do have, detrimental effects within the state.

> Whether the trial court had jurisdiction to try the conspiracy charge presents a question of law that we review de novo. *People v. Laws*, 218 Mich.App 447, 451; 554 NW2d 586 (1996).

> [T]o be convicted of conspiracy to possess with intent to deliver a controlled substance, the prosecution had to prove that (1) the defendant possessed the specific intent to deliver the statutory minimum as charged, (2) his coconspirators possessed the specific intent to deliver the statutory minimum as charged, and (3) the defendant and his coconspirators possessed the specific intent to combine to deliver the statutory minimum as charged to a third person. [*People v. Mass*, 464 Mich. 615, 629-630; 628 NW2d 540 (2001), citing *People v. Justice (After Remand)*, 454 Mich. 334, 349; 562 NW2d 652 (1997) (emphasis omitted).]

> The defendant must know of the conspiracy, must know of the objective of the conspiracy, and must intend to cooperate to further the objective of the conspiracy. *People v. Blume*, 443 Mich. 476, 485; 505 NW2d 843 (1993). "The gist of a conspiracy is the unlawful agreement." *Mass*, *supra* at 632. The purpose of the conspiracy need not be accomplished and, in fact, the conspiracy is separate and distinct from the substantive crime that is its object. *Id.*

> We conclude that Michigan had jurisdiction over the conspiracy charge in this case.

*     *     *

> In this case, there was evidence that defendant was acting with Janet and Wendy, as well as Christopher and Brenda, for the unlawful purpose of distributing cocaine in Michigan, between March and June 1997. In fact, defendant approached Wendy and Janet in March after his Michigan connection, Christopher, became unreliable. While many deliveries took place in Indiana, some occurred in Michigan. Moreover, the evidence was unrefuted that the resale of the cocaine occurred in Michigan, to customers in Coldwater and Lansing. Defendant was specifically aware that Wendy and Janet were reselling the cocaine in Michigan. In particular, the evidence indicated that he was well aware of the customers in Lansing. He specifically asked Janet to encourage the Lansing buyers to purchase more.

We acknowledge that Janet testified that defendant did not specifically dictate who they should sell the cocaine to or how much they should buy. They could do what they wanted with the cocaine after getting it from him. We find, however, that these facts are not outcome determinative under the circumstances. Defendant asked Janet and Wendy to do business with him. The business was the purchase of cocaine for resale to buyers in Michigan. If Wendy and Janet did not resell the cocaine they obtained from defendant, they could not pay for more. Further, Wendy and Janet's contacts with defendant were via telephone from Michigan. They called defendant directly to arrange the transactions and delivery places. Defendant's delivery men sometimes delivered the cocaine directly to Michigan. This case is unlike *Blume*, where there was only one transaction, where the evidence indicated that the defendant did not know of the buyer's plans, and where the only contacts occurred in Florida, i.e., the meeting, sale and delivery.

Under the circumstances, there was more than a sufficient factual basis to assert jurisdiction over defendant on the conspiracy charge.

*Diaz*, 2002 WL 31450796 at *5-*8 (footnote omitted).

Under the facts of this case, Attorney Wilkinson did not provide ineffective assistance of counsel in failing to file an interlocutory appeal. On direct appeal, the Michigan Court of Appeals rejected petitioner's argument that the State of Michigan lacked jurisdiction to bind over petitioner to the Branch County Circuit Court for trial on the conspiracy charge. Given this holding, there is no basis for petitioner to claim that Attorney Wilkinson would have prevailed on this issue in an interlocutory appeal. As discussed, Judge Cherry later concluded that filing such an interlocutory appeal was without merit. "Counsel was not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel." *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998). Accordingly, petitioner has failed to demonstrate that Attorney Wilkinson was deficient for failing to file an interlocutory appeal.

Furthermore, petitioner has not demonstrated prejudice. The appropriate standard for determining prejudice caused by alleged ineffective assistance of counsel is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Attorney Wilkinson's failure to file a pre-trial interlocutory appeal did not deprive petitioner of a fair trial. In the context of obtaining federal habeas relief, a petitioner's claim involving a pretrial issue, such as an improper bindover, is not grounds for overturning a conviction.

> [A]n objection to being bound over for a trial after the preliminary examination is not a basis for overturning a conviction.  *See, for e. g., Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) ("although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause"); *Yohey v. Collins*, 985 F.2d 222, 228-229 (5th Cir.1993) (a habeas petitioner's claim for federal habeas relief for pretrial issues are mooted by his subsequent conviction); *Sweezer v. Borgert*, No. 91-2415, 1992 WL 323078 at *1 (6th Cir. Oct.21, 1992) ("[petitioner's] objection to being bound over for trial after the preliminary exam is not a basis for overturning his conviction").

*Jordan v. Romanowski*, No. 1:04-cv-565, 2007 WL 2302400 at *12 (W.D. Mich. Aug. 8, 2007). For these reasons, petitioner's claim of ineffective assistance should be denied.

### E.  Counsel was ineffective in failing to deliver an opening statement

Petitioner contends that Attorney Wilkinson was ineffective for failing to make an opening statement to the jury.[5]  In this regard, petitioner states that the jury was unaware of his defense theory, i.e., that he was simply a used car dealer, and contends that had Attorney Wilkinson given an opening statement, "the jury would have been better prepared to align Petitioner's version of the offense with the facts presented during the trial."  Petitioner's Objections (docket no. 25) at p. ID# 163.  Under Michigan law, counsel's decision to make an opening statement is a matter of trial strategy.  *See People v. Calhoun*, 178 Mich. App. 517, 524 444 N.W.2d 232 (1989); *People v. Powelczak*, 125 Mich. App., 231, 242, 336 N.W.2d 453 (1983).  Indeed, petitioner acknowledged that "[i]t is not mandatory for defense counsel to give an opening statement."  Petitioner's Brief (docket no. 2) at p. ID# 44. "An attorney's decision not to make an opening statement is ordinarily a mere matter of trial tactics and  . . .  will not constitute . . .  a claim of ineffective assistance of counsel."  *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) (internal quotation marks omitted). Accordingly, this claim of ineffective assistance should be denied.

### F.  Counsel was ineffective on appeal

Finally, petitioner contends that Attorney Wilkinson provided ineffective assistance of appellate counsel because he acted as both trial and appellate counsel and was "potentially in

---

[5] As discussed, Judge Cherry did not explicitly rule on this issue.

conflict with his own interest and unlikely to raise ineffective assistance against himself." Petitioner's Objections (docket no. 25 at p. ID# 164). As an initial matter, petitioner has presented only a conclusory claim of ineffective assistance of counsel. Petitioner does not develop this argument other than to cite one decision, *Nichols v. United States*, 75 F.3d 1137 (7th Cir. 1996). "Merely conclusory allegations of ineffective assistance . . . are insufficient to state a constitutional claim." *Wogenstahl v. Mitchell*, 668 F.3d 307, 343 (6th Cir. 2012). Furthermore, petitioner's claim ineffective assistance of appellate counsel fails on the merits. Petitioner asks this Court to rule that a criminal defendant's trial counsel who later acts as appellate counsel is *per se* ineffective due to a "potential" conflict of interest. Contrary to petitioner's claim, there is no *per se* conflict of interest when the same attorney represents a criminal defendant on direct appeal. While petitioner cites *Nichols* as his authority for habeas relief, that case does not recognize such a *per se* conflict of interest. On the contrary, in *Nichols*, the court evaluated the merits of the ineffective assistance claim under the *Strickland* standard after observing that "[the petitioner] was represented by the same attorney . . . at trial and on direct appeal; thus he is allowed to raise his ineffective assistance claim on collateral attack." *Nichols*, 75 F.3d at 1141. More importantly, the Sixth Circuit has determined that "the rather normal occurrence of trial counsel also acting as appellate counsel on direct appeal . . . in itself, does not create any obvious prejudice." *Whiting v. Burt*, 395 F.3d 602, 619 (6th Cir.2005). In reaching this determination, the Sixth Circuit found such representation to be the norm, observing that "the rules of this Court provide that trial counsel in criminal cases, whether retained or appointed by the district court, is responsible for the continued representation of the client on appeal unless specifically relieved by this Court. 6 Cir. R. 101(a)." *Id.* at 619, fn. 10. Accordingly, petitioner's claim of ineffective assistance of appellate counsel should be denied.

## VII.    Recommendation

For these reasons, I respectfully recommend that the habeas petition be **DENIED**.

Rule 8, Rules Governing § 2254 Cases in the United States District Courts.


Dated:  February 9, 2015                              /s/ Hugh W. Brenneman, Jr.
                                                      HUGH W. BRENNEMAN, JR.
                                                      United States Magistrate Judge


ANY OBJECTIONS to this Amended Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).